AALHOLM et al. v. PEOPLE.

In re KENNEALLY.

(Supreme Court, Appellate Division, First Department. July 10, 1913.)

EVIDENCE (§ 309*)—PEDIGREE DECLARATIONS—PRELIMINARY PROOF.

Declarations offered to show that petitioner was the son of a certain person now dead so as to make him the half-brother and heir of decedent, were not admissible, in absence of evidence other than such declarations to prove petitioner's relationship to the decedent's family.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. § 1162; Dec. Dig. § 309.*] .

Appeal from Special Term, New York County.

Proceeding by Matthias Aalholm and Robert O'Brien, as executors of William A. Kinnilly, deceased, against the People of New York, in which John Kenneally petitioned to have the property of a decedent paid to the first heir at law and next of kin. From an order of the Special Term confirming a referee's report and directing the State Treasurer to pay to petitioner as heir at law and next of kin all personalty turned in to the Treasurer, an appeal was taken. Order reversed, and proceeding dismissed.

Argued before INGRAHAM, P. J., and McLAUGHLIN, LAUGHLIN, CLARKE, and SCOTT, JJ.

Thomas Carmody, Atty. Gen. (August Merrill, of Utica, of counsel, and Francis M. Ganley, of New York City, on the brief), for the People.

J. Van Vechten Olcott, of New York City (Nelson H. Tunnicliff and Edward K. Sumerwell, both of New York City, on the brief), for respondent.

CLARKE, J. William A. Kinnilly died in Brooklyn on or about April 16, 1868, leaving a considerable estate of both real and personal property and a will which was duly probated. By the terms of the will, after several small legacies, he left his brother "Edward Kinnilly (or Edward Kinnealey, as he used to sign his name) provided he shall have survived me," the sum of $20,000 for his own use and benefit forever. There followed a bequest of the said sum to the widow and issue of his brother Edward in case he should predecease the testator, otherwise to the residue of the estate. The will contained this clause:

"It is now about forty years since I parted with my brother Edward; the separation took place in Canada at a place called Amherstberg; he was going to the state of Michigan. Edward was born on the 30th of July, 1813, in England. Our father's name was John; our mother's maiden name was Mary

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Finn. Our parents were both natives of Ireland. I desire particularly my executors to make diligent inquiries and search, particularly about Ann Arbor, State of Michigan, and to discover, if possible, my long lost brother, or, in the event of his death, any of his legitimate offspring."

The residue of his estate was left in trust to his executors for certain charitable uses. The trust was declared void by a judgment of the Supreme Court dated the 9th day of December, 1870, and the decree provided:

"That the people of the state of New York, defendants in this action, are, after the passing of the accounts of the plaintiff's executors, entitled to said moneys, real estate and property, subject, nevertheless, to the claims and rights of any lawful heirs or next of kin of said deceased who may hereafter be discovered or appear."

Since the payment and delivery of the residue of the property of William A. Kinnilly to the people of the state, upwards of 100 petitioners have claimed this property, all of whose claims have been disallowed, and the claimants declared to be not related to the deceased. The executors made the searches requested by the will, and could learn nothing of Edward. In 1868 they sent a man by the name of Hoffmann to Canada, and he testified that he did not find anybody that had heard of Edward since he was 14 years old.

The petitioner, John Kenneally, of Idaho City, Idaho, claims to be a half-brother of the deceased William A. Kinnilly. The father of William A. Kinnilly, the deceased, was John Kinneally, a sergeant in the sixty-eighth regiment of infantry in the British army. He enlisted at Castle Bar, County Mayo, Ireland, December, 1816. He went with his regiment to Canada in 1818, was stationed in different parts of Canada, and was at Amherstberg 1827 to 1829. He departed from Amherstberg, leaving his wife and sons behind. William was left in care of Father Fluet, a priest, and remained with him about two years. Fluet's testimony was that he first knew Kinneally in the latter part of 1828, and that his acquaintance continued until his regiment was withdrawn; that he appeared to be about 50 years of age. He had never heard from him directly after he left Amherstberg. He was a married man; his wife's maiden name had been Mary Finn. He had two sons by his said wife Mary Finn, William and Edward. William was then 15 or 16 and Edward a couple of years younger. His wife did not leave Amherstberg with him. She remained behind for a short time, and afterwards left with her son Edward. He was informed at the time that she had gone to Ann Arbor, Mich. He never saw her afterwards. She was younger apparently than her husband, but the disparity in their years was not great. His son William used to assist him at mass as an acolyte. As John Kinneally was about to leave he begged him to take William. He consented to do so and William lived with him as a member of his household from the departure of his father until the year 1831. Edward clung to his mother, who separated herself from her husband when the regiment left. They did not agree together, and she went away from Amherstberg with Edward, and William remained there with him. Edward was sickly. The records of the War Office show that Kinneally embarked for Eng-

land on the 14th of August, 1829; that he was an invalid at Chatham, having arrived on the 8th of October. He was discharged at Chatham on January 13, 1830, on a pension of six pence per diem. His regimental discharge papers give his age "about 38." The hospital record states "looks much older than he is by discharge." He was paid his first pension in London on the 29th of March, 1830, and on the 30th was transferred to Quebec. His declarations are dated at York, Upper Canada, and he commuted his pension in 1832. He received a grant of 200 acres of land as a discharged sergeant of the sixty-eighth regiment. As appears by his discharge papers he was by occupation a servant.

The foregoing facts have been matters of record for many years in the various proceedings taken to secure this estate, and were accessible to petitioner who began a proceeding some 19 years prior to that at bar, which was not pushed to a conclusion. It appears then that Sergeant John was back in Canada in 1830, about a year after he left there, leaving his wife and children. This was the state of the evidence when the referee received certain declarations testified to by the claimant and his witnesses.

The petitioner claims that he is the son of Sergeant John by a subsequent marriage, and therefore the half-brother of the deceased, William. He testified that he was born August 29, 1833, at a place on the Canada side of Niagara Falls now called Falls View; that his father was John Kinneally, and his mother was Margaret Kearns Hardiman; that his mother had a daughter by her first husband, Hardiman, by the name of Mary; that she came to live with his mother about 2 years before her death, and subsequently married James Moan and thereafter died in Cleveland about 26 years ago, leaving children; that he was 12 or 13 years old when his mother died in 1846 at Cleveland, Ohio; and that his mother told him he was two years and two months old when his father died. She said he died at Cleveland. Petitioner says:

"I don't remember him at all, have no recollection of my father at all, not the slightest."

Without connecting his mother with Sergeant John or the decedent William, or any member of the Kinneally family, claimant was permitted to testify as to what he said his mother had told him from the time he was able to remember until her death, when he was about 12 years old. He said his mother told him that his father was a soldier in the British army; that he learned that it was the sixty-eighth British foot regiment not from his mother, but when claimant was in Canada; that his mother said his father was born in county Tipperary, Ireland; that he was a widower at the time she married him, and had two sons, William and Edward; that one of them had gone to study as a priest; that, upon leaving the army, his father was head waiter for Adam Crysler; that, instead of accepting a pension, he commuted and took crown lands on the Penetanguishene road; that he and his mother had discussed the lands; that these lands were in the region west of Georgian Bay; that his mother said that his father repeatedly said that these lands should be the claimant's; that his mother told him

that it was his father's dying wish that the claimant should have the crown lands given to him on the Penetanguishene road.

There was testimony admitted from what were called the Cleveland witnesses, Rose Dangle, Margaret Coughlin, Jennie Moan, Katie Weet, and John Moan. These were the children of Mary Hardiman Moan who was the daughter of Margaret Kearns Hardiman, and consequently, as petitioner claims, his half-sister. These nieces and nephew by the half blood of the petitioner were permitted to testify to declarations made to them by their mother of declarations made to her by their grandmother, whom petitioner claims was his mother. There is not a scintilla of evidence tending to show relationship between either of the declarants and William A. Kinnilly, the decedent, or Sergeant John or Edward, except the declarations themselves, and there is not a scintilla of evidence except the declarations so testified to of the claimant's mother and half-sister to furnish a foundation for the presumption of the death of Mary Finn Kinneally, the sergeant's wife, or the marriage of Margaret Kearns Hardiman with the sergeant. That is, the elemental fact of relationship to Sergeant Kinneally is supported only by declarations which are not admissible until that fact is proved aliunde.

In Fulkerson v. Holmes, 117 U. S. 389, 6 Sup. Ct. 780, 29 L. Ed. 915, the court said:

"The rule is that declarations of deceased persons who were de jure related by blood or marriage to the family in question may be given in evidence in matters of pedigree [citing cases]. A qualification of the rule is that, before a declaration can be admitted in evidence, the relationship of the declarant with the family must be established by some proof independent of the declaration itself."

In Young v. Shulenberg, 165 N. Y. 385, 59 N. E. 135, 80 Am. St. Rep. 730, the same rule is stated as follows:

"Pedigree is the history of family descent, which is transmitted from one generation to another by both oral and written declarations; and, unless proved by hearsay evidence, it cannot in most instances be proved at all. Hence declarations of deceased members of a family made ante litem motam are received to prove family relationship, including marriages, births, and deaths, and the facts necessarily resulting from those events. * * * Before the declarations can be received, however, as evidence of pedigree, it must appear that the person making them was a member of the family, and that he is dead, incompetent, or beyond the jurisdiction of the court. Therefore before the declarations of Anne Ellice, as contained in the recital of her deed, could be received in evidence on the question of pedigree, it was necessary for the plaintiff to show that she was a member of the family of Alexander Ellice, and that she could not be produced or testify owing to one of the contingencies named. While the law required that her relationship to the Ellice family should be shown by evidence independent of her own declarations, still, as was recently held in an important case, 'but slight proof of the relationship will be required, since the relationship of the declarant with the family might be as difficult to prove as the very fact in controversy' "—citing the Fulkerson Case, supra.

In both of the cases cited the declarations were contained in ancient deeds, which, with the original patents to the lands in question and other muniments of title duly recorded, had been in the possession of the parties tendering them for many years.

142 N.Y.S.—59

The most recent case in this state is Layton v. Kraft, 111 App. Div. 842, 98 N. Y. Supp. 72. In that case the decedent was a Mrs. St. John. The plaintiff testified to declarations of his mother, his grandmother, and his great-grandmother, Mrs. Hyer, to the effect that Mrs. St. John was the daughter of Mrs. Bos, who was the daughter of Mrs. Hyer, his great-grandmother, and hence the sister of his grandmother. The plaintiff by competent evidence, independent of these declarations, had proved his own descent from Daniel and Katherine Hyer, his great-grandparents. To prove the decedent's descent from the same ancestors, plaintiff offered in evidence certain records of the Collegiate Reformed Church in the city of New York. The trial court held there was not sufficient proof of the authenticity of these records to entitle them to be received in evidence, and that, without them, there was no independent proof that plaintiff's ancestors were members of the family of Mrs. St. John, the deceased, sufficient to entitle declarations of deceased persons to be given in evidence. This court said:

"We think the court erred in not receiving the records offered in evidence. * * * Before these declarations can be received in evidence, however, it must appear that the person making them was a member of the family whose descent is sought to be traced. * * * Had the records been received in evidence, they would have tended to show that Anna E. St. John was a member of the family of plaintiff's grandmother and great-grandmother, who were dead, and the declarations of these persons as to the relationship of Anna and her mother to the plaintiff's grandmother would have been proper, as well as their declarations as to the decease of other members of the family, without issue."

Blackburn v. Crawford, 3 Wall. (70 U. S.) 175, 18 L. Ed. 186, was an action in ejectment. Dr. Crawford died intestate. His brother, Thomas B. Crawford, died before him. His children claimed the estate as nephews and nieces of the intestate. As said in the statement of facts, their "title * * * was clear, but for a single difficulty—the fact that their legitimacy was called in question." The family name of the mother was Elizabeth Taylor. Prior to this action, Thomas B. Crawford being dead, she gave under oath, in a judicial proceeding, her own account of her relations to him; and, while admitting that their relations were meretricious at the commencement thereof, testified to a secret marriage after the birth of two of the children. To prove the marriage, counsel for the children, plaintiffs in the case, offered in evidence the deposition of a priest to prove that he had frequently heard Sarah Evans say that Mr. Thomas B. Crawford and Elizabeth Taylor were married. In order to lay a foundation for this testimony, it was proved aliunde that Sarah Evans was the sister of Elizabeth Taylor, and that she had been dead several years. The testimony was admitted under objection. Swayne, J.:

"The first exception relates to the admission of evidence as to what Sarah Evans had said in regard to the marriage of her sister, Elizabeth Taylor, with Dr. Crawford. Greenleaf says (1 Ev. § 103): 'It is now settled that the law resorts to hearsay evidence in the case of pedigree upon the ground of the interest of the declarants in the person from whom the descent is made out, and their consequent interest in knowing the connections of the family. The rule of admission is therefore restricted to the declarations of deceased persons who were related by blood or marriage to the person and therefore

interested in the succession in question.' It is well settled that, before the declarations can be admitted, the relationship of the declarant to the family must be established by other testimony. 1 Taylor on Ev. § 576. Here the question related to the family of Dr. Crawford. The defendants in error claimed to belong to the family and to be his nephew and nieces. To prove this relationship, it was competent for them to give in evidence the declarations of any deceased member of that family. But the declarations of a person belonging to another family, such person claiming to be connected with the family only by the intermarriage of a member of each family, rests upon a different principle. A declaration from such a source of the marriage which constitutes the affinity of the declarant is not such evidence aliunde as the law requires. It is insisted by the defendants in error, upon the authority of Monkton v. Attorney General, 2 Russell & Milne, 156, that it was sufficient to show the relationship of the declarant to Elizabeth Taylor. None of the writers on the law of evidence have given it so wide a scope. Hubback on Succession, 660, thus states the principle which it decides: 'It is sufficient that the declarant be connected by extrinsic evidence with one branch of the family touching which his declaration is tendered.' Lord Brougham himself said in that case: 'I entirely agree that, in order to admit hearsay evidence in pedigree, you must, by evidence de hors the declarations, connect the persons making them with the family. To say that you cannot prove the declarations of A., who is proved to be a relation by blood of B., touching the relationship of B., with C., unless you have first connected him with C., is a proposition which has no warrant, either in the principle upon which hearsay is let in, or in the decided cases.' If it had been proved by independent testimony that Sarah Evans was related by blood to any branch of the family of David Crawford, and her declarations had been offered to prove the relationship of another person claiming, or claimed to belong also to that family, this case would be in point. But the declaration of Sarah Evans offered to prove that her sister was connected by marriage with a member of that family was neither within the principle nor the language of that authority. * * * In Doe v. Fuller, 2 Moore & Payne, 24, Chief Justice Best said: 'If there were no other evidence than the declarations of John to show that James was a member of the family, they could not have been received, as that would be carrying the rule as to the admissibility of hearsay evidence further than had ever yet been done, viz., to allow a party to claim an alliance with a family by the bare assertion of it.' We think the court erred in admitting the testimony."

In the case at bar the decedent William is shown by competent evidence to be the son of Sergeant John, but the only testimony offered to show that the petitioner is also the son of Sergeant John and the half-brother of the decedent, are his own statements, and the declarations of his dead half-sister by another father and of his dead mother that she was the second wife of Sergeant John who at the time he married her was a widower. There are no tombstones, deeds, records, documents, letters, diaries, or entries in old Bibles. The proof is made by declarations alone with no evidence aliunde making the declarations competent. We think, therefore, that the testimony as to the said declarations was erroneously admitted in evidence. Without said testimony there is nothing to support the order appealed from.

But from a careful examination of the whole record we are further of the opinion, even if the alleged declarations were admissible, that, under the peculiar circumstances of this case, the entire absence of independent evidence supplemental to that which had been matter of record in the courts of this state for many years prior to this proceeding, the case with the known facts could be transmuted into alleged declarations, the 19-year interval between the first proceeding by the

claimant and this and other suspicious matter, a finding that the claimant is the son of Sergeant John Kinneally and the half-brother of the decedent, William A. Kinnilly, is not supported by evidence sufficient to uphold the order appealed from.

The order should therefore be reversed, with costs and disbursements to the appellant, and proceeding dismissed, with $10 costs and disbursements. All concur.